**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| L.F. b/n/f MARY RUFFIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-08-2415 |
| | § | |
| HOUSTON INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

This is an appeal from the decision of a Texas Education Agency special education hearing officer.  Under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., the parents of a disabled child may file a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  20 U.S.C. § 1415(b)(6).  The plaintiff, Mary Ruffin, filed a complaint with the Texas Education Agency on behalf of her child, L.F., a student with disabilities who is eligible to receive special education and related services from the defendant, the Houston Independent School District (HISD).  *L.F. b/n/f M.R. v. Houston Indep. Sch. Dist.*, Docket No. 222-SE-0407.  Ruffin alleged that HISD failed to provide L.F. with a free appropriate public education ("FAPE") for the 2006-2007 and 2007-2008 school years.  Ruffin alleged that HISD failed to provide "Individual Education Programs" ("IEP") adequate for L.F.'s  condition, as the IDEA requires.  After an evidentiary hearing, the hearing officer issued an opinion concluding that HISD provided Ruffin's child with a FAPE consistent with the IDEA's requirements and denying the relief Ruffin sought.  In this suit, Ruffin alleges violations of the IDEA, 20 U.S.C. § 1400 *et seq.*, and the

Rehabilitation Act of 1973, 29 U.S.C. § 794.  Ruffin also alleges civil rights violations under 42

U.S.C. § 1983.  (Docket Entry No. 32).  Ruffin argues that this court should disregard the  hearing

officer's decision because of an inappropriate relationship between that officer and HISD's counsel.

Ruffin alleges that the hearing officer's decisions were not based on the law but on "bedroom

affairs."  (Docket Entry No. 31, at 2).

       HISD moved for summary judgment that the administrative record establishes that as a

matter of law, Ruffin  has not shown any violation of federal law and is not entitled to the relief she

seeks.  (Docket Entry Nos. 18, 39).  Ruffin, who is proceeding *pro se*, moved to "Order this Court

to Show Logal [sic] Cause that this Defendant Established Right to a Summary of Judgment and

Motion to Order, this Court, When it's Established, that the Defendant Established No Right, to an

Summary of Judgment, The Summary of Judgment is Dismissed in it's Entirety."  (Docket Entry

Nos. 28, 29).  Ruffin then responded to the summary judgment motion, (Docket Entry Nos. 36, 52).

She also filed a motion to "order this court, not to refer or use any of the administrative record, from

this hearing officer, due to the conflict of interest."  (Docket Entry No. 37).  HISD responded,

(Docket Entry No. 38), and Ruffin replied, (Docket Entry No. 40).   Ruffin then moved to

supplement the summary judgment record, (Docket Entry No. 53), and HISD responded.  (Docket

Entry No. 54).       HISD also moved for sanctions for Ruffin's accusation that HISD's counsel

and the hearing officer had an inappropriate "bedroom" relationship and for Ruffin's failure to

conduct a reasonable prefiling inquiry into the facts.  (Docket Entry No. 41).  Ruffin moved to

"order this court to order this defendant to submit documents that support the allegation that plaintiff

has often included similar attacks."  (Docket Entry No. 42).  Ruffin then filed a motion to "deny the

defendant motion for sanctions," arguing that her allegations were justified because the HISD's

counsel had stated that he and the hearing officer had "a professional relationship and a healthy

respect for one another."  (Docket Entry No. 44).  HISD responded, (Docket Entry No. 47), and Ruffin replied, (Docket Entry No. 50).

Based on a careful review of the pleadings; the motions, responses, and replies; the record; and the applicable law, this court grants HISD's motion for summary judgment and grants in part and denies in part HISD's motion for sanctions.  The rulings on the pending motions also include the following: Ruffin's motions for leave to amend and for extension of deadlines, (Docket Entry Nos. 34, 43, 46), are granted; Ruffin's motions to dismiss HISD's summary judgment motion, (Docket Entry Nos. 28, 29, 36, 46), are denied; Ruffin's motions to deny HISD's motion for sanctions and to "Order this Court to Order this Defendant to Submit Documents that Support the Allegation the Plaintiff Has Often Included Similar Attacks," (Docket Entry Nos. 42, 44), are denied; and Ruffin's motions to disregard the administrative record and to supplement the summary judgment record, (Docket Entry Nos. 37, 53), are denied.

The reasons for these rulings are explained in detail below.

I.    **Background**

The administrative record establishes the relevant facts.  During her first and second-grade years, L.F. had several behavioral problems at school.  In the fall of 2003, L.F.'s second-grade teacher referred her for a "full and individual evaluation" ("FIE") as required under the IDEA if a disability is suspected.  *See* 34 C.F.R. § 300.320.  The teacher's referral stated that L.F. was "very disruptive in class; she talks aloud without permission; she laughs aloud uncontrollably at times; she ignores me (teacher); she doesn't follow directions outside the classroom." (Admin. Record at 930). The referral committee recommended an emotional/behavioral assessment for a suspected "Emotional Disturbance" ("ED").

In December 2003, a licensed specialist school psychologist issued an FIE for L.F.  (*Id.*).
The psychologist reviewed school records, interviewed L.F.'s parent and teachers, made classroom
observations, and interviewed and assessed L.F.  Based on this work, the psychologist concluded
that L.F. appeared to meet the criteria for a student with an ED.  (*Id.* at 937).  According to the
psychologist, L.F. showed characteristics of Oppositional Defiant Disorder and Attention Deficit
Hyperactivity Disorder. The psychologist  concluded that L.F. was "defiant, impulsive, easily
distracted, aggressive[,] and has poor social skills." (*Id.* at 936).  The psychologist also concluded
that L.F.'s intellectual functioning measured in the "below average range (IQ=83)," that her
"academic abilities fall within [her] ability level," and that "[s]he did not demonstrate any
educational deficits in any academic areas." (*Id.* at 935).  The psychologist found that L.F.'s
"emotional and behavioral functioning have impacted her ability to be successful in the general
education setting." (*Id.* at 937). The psychologist recommended steps that teachers and
administrators, and Ruffin, should take to help improve L.F.'s behavior.  The psychologist also
recommended that the Admission, Review, and Dismissal Committee ("ARDC") "develop a specific
behavior management plan along with behavioral I.E.P.'s." (*Id.* at 938).

After the psychological evaluation, L.F. was placed in the Behavioral Services Classroom
("BSC") at Kelso Elementary for 25 hours per week.  The BSC is a special education classroom with
fewer students than other classes.  The BSC focuses not only on teaching academics but also social
skills.  The immediate aim is to help build positive interactions between the BSC students and their
peers, with the ultimate goal of moving each BSC student back to a general education classroom on
a full-time basis.  L.F. was in the BSC for third-grade, 2004-2005, taught by Ms. Elisha Manning,
without major incident.

In October 2005, the ARDC met to develop an IEP for L.F. for the rest of 2005-2006. (Admin. Record at 869).  The ARDC reviewed L.F.'s progress for the previous school year, which included positive reports from Ms. Manning; Mr. James Walker, L.F.'s general education teacher; and Ms. Gloria Jiles, L.F.'s school counselor.  (*Id.* at 891).  The Committee developed an updated behavior support plan for L.F. as well as new academic and counseling IEPs.  (*Id.*).  The Committee agreed that because L.F. "require[d] a small-structured setting to be successful with her IEPs," she should continue in Ms. Manning's BSC class for fourth grade.  (*Id.*).  Before the meeting ended, Ruffin raised a concern about L.F.'s transportation to and from school.  The ARDC agreed to contact the Transportation Department and subsequently arranged for L.F. to receive curb-to-curb transportation.  At the end of the meeting, Ruffin signed the ARDC's recommendations, indicating that she agreed with the decisions reached.  (*Id.* at 892).  L.F. completed her fourth-grade year and met the ARDC's expectations on the State-Developed Alternative Assessment ("SDAA") test in all areas, including reading, math, and writing.  (Admin Record. at 958–60).

In September 2006, the fall of her fifth-grade year, L.F. was admitted to the hospital for "nervousness and hallucinations."  (Admin. Record at 898).  She missed the first few weeks of school as a result.  L.F. was prescribed several medications to "control her behavior."  (*Id.*).

The ARDC met on October 19, 2006 to review L.F.'s progress and develop an educational plan for the rest of the 2006-2007 school year.  The ARDC Chair was James King, Special Education Department Chair at Kelso Elementary.   At the meeting, the ARDC updated L.F.'s behavior support plan and developed new academic IEPs.  (Admin Record at 847–51; 860–63).  The ARDC recommended continued placement in the BSC class for 25 hours per week, along with 30 minutes of counseling per week.  (*Id.* at 852, 864).  The Committee also recommended modified

5

assignments and assessments and shorter reading assignments.  (*Id.* at 852).  Lastly, the Committee recommended that L.F. receive another evaluation (FIE) within 60 days.  Ruffin asked to have L.F. removed from Manning's BSC class and placed at another campus.  Ruffin accused Manning of asking L.F. about "personal business" and stated that she wished to file a complaint.  Months later, at the TEA due process hearing held after Ruffin filed a complaint alleging that HISD had failed to develop an appropriate IEP for L.F. for 2006-2007 and denied her a FAPE, Manning testified that L.F. reported that her mother was going to be on the local news because her brother's school "took [his] rights away" by continually "giving him tickets" and that her mother was going to sue the school.  (Transcript of March 12, 2008 hearing, Volume I, at 136:9–13).

In the October 2006 meeting, the ARDC provided Ruffin with a form to use if she wanted to file a complaint against Manning.  After speaking with the Regional Special Education Coordinator, King told Ruffin that more information would be needed to address her request to move L.F. to another campus.  At the end of the meeting, Ruffin asked that the school hand-deliver any mail or materials to her without an envelope instead of sending materials home with L.F.  (Admin. Record at 864).

After the October 2006 meeting, L.F. did not attend school for about three weeks.  When L.F. returned, she told school officials that, at her mother's instruction, she would not enter Manning's classroom.  King, the ARDC Chair and Special Education Department Chair, took temporary responsibility for supervising L.F. and implementing her IEPs.

The ARDC reconvened on November 2, 2006 to discuss Ruffin's request to place L.F. at another campus.  An alternative campus had not yet been approved.  The ARDC recommended continued placement in Manning's BSC classroom at Kelso Elementary.  Ruffin disagreed, stating

that she believed her daughter's behavior would not improve in the BSC classroom.  King continued to attempt to find an alternate placement for L.F.  A few weeks later, the Regional Special Education Director told King that there was a "possible placement change."  (Transcript of March 12, 2008 hearing, at 87:7–8).  King told Ruffin about the alternate campus.  Ruffin rejected the transfer option, telling King that she had changed her mind and wanted L.F. to remain at Kelso Elementary. (*Id.* at 87:9–14).

L.F. was reevaluated in December 2006.  A licensed specialist in school psychology concluded on December 12, 2006 that L.F. continued to qualify as a student with an ED.  The psychologist noted reports from Ruffin and L.F.'s teachers that L.F. is "argumentative, defiant, and threatening to others"; that she "sometimes engages in rule-breaking behavior such as lying, being disobedient, and getting into trouble"; that she "frequently engages in behaviors that are considered odd or strange, and she generally seems disconnected from her surroundings"; that she "has difficulty making friends and is sometimes unwilling to join group activities"; and that she "has difficulty maintaining necessary levels of attention at school."  (Admin Record at 900).  The psychologist concluded that L.F. would benefit from "instructional strategies that foster prosocial behavior," "frequent opportunities to use new behavioral skills in class meetings and when playing games," "[c]onsistent scheduling that includes planned and unplanned breaks," "[s]eating with few distraction[s]," and "[s]hortened assignments and homework focusing on quality not quantity." (*Id.* at 902).  The FIE, completed on December 14, 2006, stated that L.F.'s intelligence was in the low-average range (IQ=85), that her achievement test scores were commensurate with her intelligence, and that she did not show any significant educational deficits.  (*Id.* at 908–09).  Overall, L.F. performed approximately one year below her grade level.  (*Id.* at 9).  The evaluation specialist

7

recommended small group instruction, preferential seating, remedial instruction in reading and math, and a behavioral system of rewards and consequences.  (*Id.* at 910).

In January 2007, King placed L.F. with another special education teacher, Ronald Riley, who implemented L.F.'s IEPs with Manning's help.  (Transcript of March 12, 2008 hearing, at 85:1–25; 152:2–4).   King then tried to schedule an ARDC meeting to review the recently completed evaluations of L.F.  On January 4, 2007, King hand-delivered to Ruffin's home a notice of a meeting scheduled for January 11, 2007.  Because Ruffin was not home, King left the notice with Ruffin's brother.  Ruffin responded by a facsimile communication on January 8, 2007 stating that she could not attend a meeting on January 11.  Ruffin then called King to complain about him hand-delivering the notice and threatened to have him arrested for trespassing.  (Transcript of March 12, 2008 hearing, at 91:5–12).  On January 11, King mailed Ruffin a second meeting notice, proposing a meeting date of January 19.  Ruffin responded on January 16, stating that she was only available on January 30.  King could not schedule the meeting on that date because some of the necessary HISD staff members were unavailable.  King left Ruffin a telephone message on February 6, 2007 to discuss alternative dates.  Ruffin did not respond. (Admin Record. at 9).  King decided to schedule the meeting for February 15, 2007.  On February 8, 2007, King had a courier service hand-deliver another meeting notice to Ruffin at her home.  The courier service returned the notice, stating that he was informed that Ruffin did not live at that address.  (Transcript of March 12, 2008 hearing, at 90:10–21).  King sent Ruffin a copy of the meeting notice by regular mail on February 8.  (Admin. Record at 9).  King called Ruffin before the meeting began on February 15 to tell her that the documents she had requested were ready to be picked up.  (*Id.* at 10).

The ARDC met on February 15, 2007 to review L.F.'s evaluations and make

recommendations for her behavioral support plan and IEPs.  Ruffin did not attend.  The school psychologist and FIE evaluator attended and presented their evaluations and recommendations to the Committee.  (Admin. Record at 827).  Based on these reports, the ARDC concluded that L.F. should continue to receive special transportation to and from school, spend 25 hours per week in the BSC classroom, and receive 30 minutes of counseling per week.  The ARDC developed a new behavioral support plan and new IEPs for L.F.  The plan and IEPs included classroom modifications of extended time, modified assignments and assessments, oral responses, and an assigned seat.  The ARDC declined to recommend extended school year services because L.F. had not shown regression over the summer break.   Immediately after the meeting, King mailed Ruffin a copy of the ARDC meeting documents.  There is no evidence in the record that Ruffin contacted King or anyone at Kelso Elementary to discuss L.F.'s revised behavioral support plan or IEPs after receiving these documents.     On April 20, 2007, Ruffin filed a due process complaint with the Texas Education Agency ("TEA").  She complained that HISD had failed to develop an appropriate IEP for L.F. for 2006-2007, which resulted in the denial of a FAPE.  A hearing was set for May 29, 2007.  Ruffin then filed four amended complaints, which added issues to be considered, each resulting in a resetting of the hearing schedule.  The final hearing was not held until March 12–13, 2008.

On May 15, 2007, King mailed Ruffin notice of an ARDC meeting to be held on May 24, 2007, the last day of school before the summer break.  The meeting was to consider L.F.'s promotion to the sixth grade at Attucks Middle School.  (Admin. Record at 782).  On May 16, 2007, Ruffin asked to see L.F.'s test scores and an explanation of goals and objectives before the meeting.  Ruffin wanted to pick up the information at the school rather than have it sent to her.  According to

King, the information was available for pick-up on May 21, 2007.  Ruffin asserts that she did not receive the information until the morning of the meeting.

The May 24 meeting proceeded as scheduled, with Ruffin in attendance.  The ARDC reviewed L.F.'s 2006-2007 SDAA test scores, which showed that she met ARDC expectations in math and exceeded ARDC expectations in reading.  The ARDC developed a personal graduation plan for L.F. (Admin. Record at 781–96).  Because L.F. continued to qualify as a student with an Emotional Disturbance, the ARDC recommended continued placement in a BSC classroom for sixth grade and a minimum of 30 minutes of counseling per week.  (*Id.* at 782).  The ARDC developed an IEP and wrote goals and objectives for L.F. in reading, English, math, science, history, and social skills.  (*Id.* at 783–89).  The ARDC also recommended classroom modifications, including extended time, peer tutoring, modified testing, oral administration in all classes except reading and English, and preferential seating.  (*Id.* at 790).  Ruffin disagreed with the conclusion that L.F. was ready to graduate from elementary school and move on to sixth grade.  Ruffin did not believe that the test scores were accurate because she did not "see these same results when she work[ed] with" L.F.  (*Id.* at 782).  Ruffin also complained that she had received the 2006-2007 test scores that morning and had not had the opportunity to compare them to L.F.'s previous scores.  Based on Ruffin's concerns, the ARDC offered to recess the meeting until after the parties had a full opportunity to consider the data and the alternatives.  King testified at the TEA due process hearing that the agenda for the May 24, 2007 ARDC meeting had been completed and that the rescheduled meeting was to address Ruffin's concerns.  (Transcript of March 12, 2008 hearing at 102:8–12).

King attempted to reschedule the ARDC meeting.  (*Id.* at 102:21–23).  He sent Ruffin a letter on June 4, 2007 stating that she had until September 10, 2007 to reconvene the ARDC meeting.

Ruffin responded on June 6, 2007 that she was available between August 27, 2007 and September 10, 2007. (Admin. Record at 11). King tried to call Ruffin in August but "didn't get any response." (Transcript of March 12, 2008 hearing at 103:4–8). When King was able to talk with Ruffin, she asked why they had to have an ARDC meeting to discuss L.F.'s promotion to sixth grade. (*Id.* at 103:14–25). King answered Ruffin's question and asked for a specific date when she would be available. Ruffin did not respond. (*Id.* at 104:1–4).

In August 2007, L.F. enrolled in Attucks Middle School and began sixth grade. The record shows that the school implemented L.F.'s IEP that had been developed in the February 15, 2007 ARDC meeting. (Admin. Record at 16).

On October 17, 2007, the ARDC at Attucks Middle School sent Ruffin notice of a meeting to be held on October 26, 2007. The notice included L.F.'s new proposed IEPs for 2007-2008. (Admin. Record at 1006). Ruffin attended the meeting, which lasted from 9:00 a.m. to 2:00 p.m. (*Id.* at 1033–34). The IEPs included goals and objectives in reading, English, math, history, science, social skills, and counseling. (*Id.* at 1008–15). The ARDC recommended that L.F. continue receiving a majority of her instruction in the BSC classroom, but that she also attend physical education and study lab in a general education classroom. (*Id.* at 1016). L.F.'s behavioral support plan was updated and modified, and the ARDC recommended that L.F. receive one hour of counseling per week. (*Id.* at 1018). The ARDC also recommended that L.F. receive Extended School Year ("ESY") teaching in the summer of 2008 to address behavioral and academic goals. (*Id.* at 1031). Ruffin disagreed with the IEPs, stating that the instructional levels were too high. (*Id.* at 1034). Ruffin asked for an Independent Educational Evaluation, which the ARDC granted. (*Id.*). In November 2007, the staff at Attucks Middle School attempted to reconvene an ARDC meeting,

but Ruffin declined.  (*Id.* at 12).

At the completion of the first grading period of 2007-2008, L.F. passed all of her subjects with a grade of 80, except for physical education/health.  (*Id.*).  During the second grading period, L.F. achieved a 90 in math, study lab, English, and social studies, an 84 in physical education/health, an 85 in science, and a 75 in enrichment.  (*Id.*).  L.F.'s conduct grades improved from the first to the second grading period of 2007-2008.  L.F. also improved on all of her IEP objectives during this period.  (*Id.*).

The TEA due process hearing on Ruffin's April 2007 complaint against HISD was held on March 12 and 13, 2008.  The delay was due to the numerous amended complaints Ruffin filed, each adding claims against HISD.  The evidence the parties presented addressed the following contested issues:

1.     Whether HISD failed to provide  ESY services during summer 2007, and if so, whether the lack of ESY services denied L.F. a FAPE.

2.     Whether HISD failed to develop an appropriate IEP for L.F.'s 2006-2007 school year.

3.     Whether HISD failed to implement the IEP from January 2007 to the present.

4.     Whether HISD failed to give proper notice of the February 15, 2007 ARDC meeting.

5.     Whether HISD failed to submit test evaluations to Ruffin before the February 15, 2007 ARDC meeting.

6.     Whether HISD failed to reschedule a recessed May 24, 2007 ARDC meeting and then improperly implemented the IEP from that meeting in August 2007.

7.     Whether HISD failed to release behavior reports from Kelso Elementary and Attucks Middle School from August 2006 to September 28, 2007; and

8.     Whether HISD improperly denied Ruffin an Independent Education Evaluation ("IEE").

(Admin. Record at 6, 1868).  The hearing officer heard testimony from nineteen witnesses and received over 700 pages of documents into evidence.  Ruffin did not testify.

The hearing officer issued a written opinion on May 8, 2008, finding no violation of the IDEA.  The hearing officer concluded that Ruffin had failed to establish that L.F.'s IEPs were not reasonably calculated to provide her with an educational benefit.  The hearing officer also concluded that HISD did not violate any of the IDEA procedural requirements.  Ruffin filed this lawsuit, appealing the hearing officer's decision, on August 5, 2008.

**II.     Ruffin's Motions for Continuances**

HISD moved for summary judgment on November 19, 2008.  At a November 21, 2008 hearing, this court set deadlines requiring Ruffin to amend her complaint no later than January 9, 2009 and to respond to the summary judgment motion by January 23, 2009.  Ruffin filed an amended complaint on January 12, 2009, (Docket Entry No. 32), and filed a response to the summary judgment motion on January 26, 2009.  (Docket Entry No. 36).  Ruffin filed a "Motion to Order, This court to Allow the Petitioner to Submit, the Admendment [sic] to this Court, for Consideration as well as Justice.  (Docket Entry No. 34).  This motion appears to be a request for leave to file the amended complaint.  Ruffin explains difficulties with her computer that caused her to file the amended complaint three days late.  The motion for leave, Docket Entry No. 34, is granted.

HISD filed an amended summary judgment motion on February 17, 2009, addressing issues raised by Ruffin's amended complaint.  (Docket Entry No. 39).  On March 18, 2009, Ruffin filed a motion for an extension of time to respond to the amended summary judgment motion. (Docket Entry No. 43).  On March 23, 2009, Ruffin filed a "Motion for Continuance, to respond to the

13

Defendant Amended Summary of Judgment and/or Motion to Dismiss the Defendant Amended Summary of Judgment." (Docket Entry No. 46). Ruffin argued that the amended summary judgment motion should be denied because "The Defendant didn't have a right to file, the Summary of Judgment" and "the Defendant again submitted no sworn affidavit, from no teacher, no principal, no Houston Independent School District Staff." (*Id.* at 7–8). In the alternative, Ruffin asked for a continuance to respond to the amended summary judgment motion. Ruffin asserted that she was not aware she only had 20 days to respond because this court had previously given her "much more time, to respond to the Defendant previous Summary of Judgment, so therefore, the Plaintiff was waiting and believing the Court, was going to submit an date, and if that date wasn't sufficient time, and then the Plaintiff was going to file a Motion for more time." (*Id.* at 2). Ruffin responded to the amended summary judgment motion on April 15, 2009. (Docket Entry No. 52).

Ruffin's motion to dismiss HISD's amended summary judgment motion is denied. The HISD was not required to establish a right to file a summary judgment motion or to file affidavits. Under Rule 56 of the Federal Rules of Civil Procedure, "[a] party against whom relief is sought may move *at any time*, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(b) (emphasis added).[1] Ruffin's motion for an extension of time to respond to the amended summary judgment motion is granted. This court will consider Ruffin's response to the amended summary judgment motion, filed April 15, 2009.

## III.    HISD's Motion for Summary Judgment

---

[1] For the same reasons, Ruffin's motions to "Order this Court to Show Logal [sic] Cause that this Defendant Established Right to a Summary of Judgment and Motion to Order, this Court, When it's Established, that the Defendant Established No Right, to an Summary of Judgment, The Summary of Judgment is Dismissed in it's Entirety," (Docket Entry Nos. 28, 29), are denied.

### A.     The Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir.  2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir.  2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated

assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

**B.     The Legal Standard for Summary Judgment on the IDEA Claim**

"When a district court reviews a hearing officer's decision under the IDEA program, it receives the records of the administrative proceedings and also takes additional evidence at the request of any party." *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, --- F.3d ----, 2009 WL 2878053, at *4 (5th Cir. Sept. 9, 2009). "When no new evidence is presented to the district court in an IDEA suit . . . 'the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'" *Loch v. Edwardsville School Dist. No. 7*, 327 Fed.Appx. 647 (7th Cir. 2009) (quotation omitted). Although it is termed "summary judgment," the district court must "reach an independent decision based on a preponderance of the evidence." *See Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997). In reaching this decision, "courts must be careful to avoid imposing their view of preferable educational methods upon the State." *Bd. of Ed. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). State and local authorities have primary responsibility for educating children and "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *See Rowley*, 458 U.S. at 207-08 & n. 30, 102 S.Ct. 3034. Although a court's review under the IDEA is "virtually *de novo*," *V.P. ex rel. Juan P.*, --- F.3d ----, 2009 WL 2878053, at *4, this is not an invitation to "the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003) (quotation

16

omitted).  Accordingly, courts place "due weight" on the hearing officer's decision.  *V.P. ex rel. Juan P.*,  --- F.3d ----, 2009 WL 2878053, at *4.

"One of the primary purposes of the IDEA is to ensure that children with disabilities receive a 'free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'"  *Id.* (quoting 20 U.S.C. § 1400(d)(1)(A)).  HISD must "(1) provide each disabled child within its jurisdictional boundaries with a 'free appropriate public education' tailored to his unique needs, and (2) assure that such education is offered ... in the least restrictive environment consistent with the disabled student's needs."  *Id.* (quoting *Michael F.*, 118 F.3d at 247).  These requirements are implemented through developing an IEP for each disabled student.  HISD must provide a "basic floor of opportunity" that "consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the [disabled] child."  *Rowley*, 458 U.S. at 201.  HISD "need not provide its disabled students with the best possible education, nor one that will maximize the student's educational potential."  *V.P. ex rel. Juan P.*,  --- F.3d ----, 2009 WL 2878053, at *4.  "Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or *de minimis*; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement."  *Michael F.*, 118 F.3d at 248.

A district court must first determine whether the State has complied with the procedures set forth in the IDEA.  *Rowley*, 458 U.S. at 206; *see also V.P. ex rel. Juan P.*,  --- F.3d ----, 2009 WL 2878053, at *5.  Second, the court must determine if the IEP developed through the IDEA's procedures is "reasonably calculated to enable the child to receive educational benefits."  *Id.* at 206-07, 102 S.Ct. 3034.  If the court finds that the IDEA procedures were followed and that the IEP

is reasonably calculated to enable the child to receive educational benefits, "the obligations imposed by Congress and the courts can require no more." *Id.* "The party contesting the propriety of the IEP bears the burden of establishing why the IEP and the resulting placement are inappropriate under the IDEA." *Adam J.*, 328 F.3d at 808.

### C.     The Administrative Record

Ruffin argues that this court should simply disregard the administrative record because it is "tampered" by the alleged inappropriate relationship between the hearing officer and HISD's counsel. (Docket Entry No. 37). In several of Ruffin's filings, she refers to the hearing officer as HISD's counsel's "close friend," "partner," and "lover," and alleges that the hearing officer's decisions were based on "bedroom affairs." (Docket Entry Nos. 31, 32). Ruffin cites as support the statements by HISD's counsel in its motion for sanctions in this case that the allegations were baseless and that he and the hearing officer "maintain only a professional relationship and a healthy respect for one another." (*Id.*, Ex. A). Ruffin argues that the words "healthy respect for one another" confirm her allegations of an inappropriate sexual relationship. According to Ruffin, by stating that there was a "professional relationship AND a health[y] respect for each other," HISD's counsel "admitted [it] went beyond the professional rea[l]m." (Docket Entry No. 40 at 3).

Neither the administrative record nor other evidence provides any support for Ruffin's accusation that the hearing officer and HISD's counsel had any kind of inappropriate relationship. A "professional relationship" accompanied by "healthy respect for one another" does not imply anything inappropriate or provide any basis to find a conflict of interest. The record shows that Ruffin moved to recuse the hearing officer on several occasions during the administrative process. Each motion was denied. There is no basis to find these decisions erroneous.

Under the IDEA, a district court's decision is based on a review of the administrative record. *See* 20 U.S.C. § 1415(i)(2)(C); *V.P. ex rel. Juan P.*, --- F.3d ----, 2009 WL 2878053, at *4. There is no basis to find a conflict of interest that would warrant disregarding the entire administrative record or the hearing officer's findings. Ruffin's motion to disregard the administrative record, (Docket Entry No. 37), is denied.

Ruffin also moved to supplement the record with two exhibits. (Docket Entry No. 53). The first is a motion for summary judgment filed by HISD in another case involving the IDEA, in which HISD cited *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000), for the proposition that the court "should not defer to the hearing officer's findings when its own review of the evidence indicates that the hearing officer erroneously assessed the facts or erroneously applied the law to the facts." (Docket Entry No. 53, Ex. A at 13). The second is the 2009 Texas Education Agency accountability summary for the schools in HISD, including Attucks Middle School. (*Id.*, Ex. B).

The statement from *Bobby R.* describing a case holding is not additional evidence, but it is Fifth Circuit precedent on the legal standard of review for IDEA cases, which this court follows. It is not necessary to supplement the record to add this case to what this court considers. With respect to the second proposed added exhibit, Ruffin has not provided any basis for supplementing the existing record with evidence about Attucks Middle School's 2009 TEA accountability rating. "Although the statute states that the [c]ourt shall hear additional evidence at the request of the parties, several circuits have held that limits exist to the extent of additional evidence that a party may submit to the reviewing court under this 'additional evidence' provision." *Marc V. v. North East Independent School Dist.*, 455 F.Supp.2d 577, 587 (W.D. Tex. 2006), *aff'd*, 242 Fed. Appx. 271

(5th Cir.2007); *see also Teague Indep. Sch. Dist. v. Todd*, 999 F.2d 127, 131 (5th Cir. 1993) ("We hold that . . . the district court *may* take additional evidence and reach an independent conclusion based upon the preponderance of the evidence.") (emphasis added). A court may deny a request to supplement the administrative record when the proposed additional evidence relates to facts or events occurring after the administrative hearing. *See West Platte R-II Sch. Dist. v. Wilson*, 439 F.3d 782, 785 (8th Cir. 2006) (denying motion to supplement the record with evidence of child's progress after administrative hearing); *S.H. ex rel A.H. v. Plano Independent School Dist.*, 2009 WL 500180, at *2 (February 27, 2009) (same). The 2009 TEA accountability rating is unnecessary to determining whether HISD provided L.F. a FAPE in 2006-2007 and 2007-2008. Ruffin's motion to present additional evidence is denied.

### D.    Standing

HISD argues that Ruffin lacks standing to sue on behalf of L.F. because a nonattorney parent cannot appear *pro se* on behalf of his or her minor children. HISD acknowledges that parents have the right to bring their *own* claims under the IDEA, but asserts that Ruffin does not allege that her own rights have been violated. Rather, according to HISD, the complaint only alleges violations of L.F.'s rights under the IDEA. Ruffin responds that "because parents enjoy[] rights of IDEA, parent[]s came [sic] litigate our rights in the federal court." (Docket Entry No. 36, at 5).

The issue of Ruffin's *pro se* representation of L.F. was discussed at the November 21, 2008 initial conference. This court asked Ruffin whether she intended to amend the complaint to assert her own claims under the statutes. When Ruffin responded affirmatively, this court allowed her to file an amended complaint by January 9, 2009. The amended complaint alleges that L.F's "Disability needs haven't been met"; that L.F. "wasn't provided a 'free appropriate public

education', 2006-2007"; and that HISD "has failed to provide L.F. with the requisite educational benefit under IDEA." (Docket Entry No. 32). The amended complaint also alleges that "[t]he Petitioner mother requested a change of placement, as well as other programs that were available, the Petitioner mother was denied, yet the Petitioner needs weren't being met." (*Id.*).

In the Fifth Circuit, a "non-attorney parent cannot appear *pro se* on behalf of a minor child." *See Harris v. Apfel*, 209 F.3d 413, 415 (5th Cir. 2000). The Supreme Court recently held that parents have independent rights under the IDEA. *See Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 533, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007) ("We conclude IDEA grants parents independent, enforceable rights. These rights, which are not limited to certain procedural and reimbursement-related matters, encompass the entitlement to a free appropriate public education for the parents child."). The Court found that a parent's IDEA rights were of equal extent to the child's because under the IDEA, the parent is involved in all phases of crafting an IEP and parents are parties at the administrative level. There is no implication under the IDEA that parents should not continue as parties in a civil action appealing the administrative determination. *Id.* at 527. Because parents' IDEA rights are coterminous, or of equal extent, with the child's rights, the Court found it unnecessary to decide whether IDEA entitles a parent suing *pro se* to litigate the child's claims. *See id.* at 535 ("In light of our holding we need not reach petitioners' alternative argument, which concerns whether IDEA entitles parents to litigate their child's claims *pro se*." ).

The lower courts have followed *Winkelman* and held that parents could sue a school district under the IDEA to challenge procedural violations or the denial of FAPE to their child. *See*, *e.g.*, *Woodruff v. Hamilton Township Public Schools*, 305 Fed. App'x 833, 836 (3d Cir. 2009) ("[T]he Woodruffs may prosecute their legally cognizable interests in B.W.'s FAPE without an attorney.");

*D.E. v. Central Dauphin School Dist.*, 2009 WL 904960 (M.D. Pa. March 31, 2009) (citing *Winkleman* and concluding that parents had "standing to bring claims against the District"); *M.W. ex rel. Wang v. Clarke County School Dist.*, 2008 WL 4449591, at *7–8 (M.D.Ga. Sept. 29, 2008) (same); *J.R. ex rel. W.R. v. Sylvan Union Sch. Dist.*, 2008 WL 682595, at *1 (E.D. Cal. March 10, 2008) ("*Winkleman* enables plaintiff parents herein to pursue their IDEA claims without counsel."); *cf. French v. New York State Dept. of Educ.*, 2008 WL 4426625, at *1 (N.D.N.Y. Sept. 24, 2008) (finding that parent lacked standing to pursue the claims in the complaint, "all of which he asserted on behalf of his daughter", but giving plaintiff the opportunity to hire an attorney or amend complaint to assert his own claims).

Ruffin alleges several procedural violations of the IDEA.  The amended complaint refers to parents' rights under the IDEA "to examine any records relating to their child and to obtain an 'independent educational evaluation of the [ire] child" and to receive "written notice of any changes in an IEP." (Docket Entry No. 32) (alteration in original).  Ruffin  alleges in the amended complaint that L.F. was denied FAPE.  Ruffin alleges that she requested a change of placement for L.F., which was denied, and that L.F.'s educational needs were not met because the request was denied.  Ruffin challenges the substantive determination that L.F. received FAPE.  In light of *Winkelman* and the fact that the IDEA allows "any party aggrieved" by the final decision of an administrative hearing officer "to bring a civil action . . . in a district court of the United States, without regard to the amount in controversy," 20 U.S.C. § 1415(i)(2)(A), this court concludes that Ruffin has standing to pursue her claims.  The amended complaint, liberally construed as is appropriate for a *pro se* litigant, alleges that Ruffin's own rights as a parent under the IDEA were violated, including her claims challenging HISD's procedures and her claims relating to "the substantive adequacy of the

education provided to [L.F.] [and][t]he right to a free appropriate public education for [L.F.]." *See Winkelman*, 550 U.S. at 531–32, 127 S.Ct. 1994.  The merits of Ruffin's IDEA claim are examined below.

      **E.**      **Analysis of the IDEA Claim**

To establish that HISD failed to provide L.F. with a FAPE, Ruffin must show that: (i) HISD failed to comply with the procedures set forth in the IDEA; or (ii) the IEP developed by HISD through the IDEA's procedures was not reasonably calculated to enable L.F. to receive educational benefits.  *See Bd. of Edu. v. Rowley*, 458 U.S. 176, 207-08, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982).

      **1.**      **Did HISD comply with the IDEA's Procedural Requirements?**

IDEA procedures guarantee parents the right to examine school records, to participate in the development of IEPs for their children, and an impartial due process hearing to air complaints about the school district's "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  20 U.S.C. § 1415(b)(6); *see also* 20 U.S.C. §§ 1415(b)(1)-(5), 1415(f).  Parents have the right to participate fully in meetings relating to the IEP and their child's evaluation.  *Id.* § 1415(b).  Parents also have the right to request an independent evaluation of their child at the school system's expense.  *Id.*; 34 C.F.R. § 300.502(b)(2)(ii).  The school system must give parents written notice of their IDEA rights when: their child is initially referred for evaluation; they are notified about each IEP meeting; their child is reevaluated, and they register any complaint about the school system's effort to provide a free appropriate public education for their child.  20 U.S.C. § 1415(d)(1).  In some situations, a procedural violation may "warrant a finding that, as a matter of law, the school has failed to provide

a free appropriate public education." *Adam J. ex rel. Robert J.*, 328 F.3d 804, 811 (5th Cir. 2003) (quoting *Buser by Buser v. Corpus Christi Indep. Sch.*, 51 F.3d 490, 493 (5th Cir. 1995)).  The procedural violation, however, must result in the loss of an educational opportunity to be actionable. *Id.* at 812.

　　　Ruffin alleges that HISD violated the IDEA's procedural requirements by failing to provide her proper notice of ARDC meetings, failing to provide her with periodic progress reports for L.F., failing to conduct manifestation determination reviews before disciplining L.F., and changing L.F.'s placement with Ruffin's permission.  Ruffin also alleges that HISD violated the IDEA because some of L.F.'s teachers were not "highly qualified" or trained in special education.

　　　HISD moves for summary judgment based on Ruffin's failure to exhaust the administrative remedies on her claims that HISD failed to provide periodic progress reports, failed to conduct manifestation determination reviews, and failed to  provide qualified teachers for L.F.  The IDEA ensures parents "an opportunity to present complaints with respect to any matter relating to identification, evaluation, or educational placement of the child, or the provision of free appropriate public education to such child." 20 U.S.C. § 1415(b)(1)(E).  Section 1415(b)(2) guarantees that parents with such a complaint have access to an impartial due process hearing through a state or local educational agency. *Gardner v. School Bd. Caddo Parish*, 958 F.3d 108, 111 (5th Cir. 1992). Section 1415(f) requires that a plaintiff first exhaust the state or local administrative process before filing suit in federal district court.  "[I]t is beyond doubt that the statute provides that a plaintiff must first exhaust the state administrative remedies before bringing an action in federal court, if the complaint is one falling under § 1415(b)(1)(E)." *Gardner*, 958 F.3d at 111.  "The IDEA's exhaustion requirement serves a number of policy objectives: it allows deference to agency expertise

in resolving educational matters; it gives the agency a first opportunity to correct errors; it presents courts with a more fully developed record; and it prevents parties from deliberately disregarding the statute's comprehensive procedures and remedies." *Marc v. North East Indep. Sch. Dist.*, 455 F.Supp.2d 577, 592 (W.D. Tex. 2006); *see also Papania-Jones v. Dupree*, 275 Fed. App'x 301, 303 (5th Cir. 2008) ("By failing to exhaust the IDEA's administrative remedies, the Jones family did not give the State an appropriate opportunity to resolve their complaints prior to filing suit against the State."). If a plaintiff's complaint falls under § 1415(b)(1)(E) and she fails to exhaust her administrative remedies before filing suit, the federal district court lacks subject matter jurisdiction over that suit and must dismiss it. *Eddins v. Excelsior Indep. Sch. Dist.*, 88 F.Supp.2d 683, 689 (E.D. Tex. 2000); *see also Gardner*, 958 F.2d at 111 (dismissing IDEA claim for failure to exhaust administrative remedies); *Flores v. Sch. Ed. of DeSoto Parish*, 116 Fed. Appx. 504, 511-12 (5th Cir. 2004) (same); *Rafferty v. Cranston Pub. Sch. Comm.*, 315 F.3d 21, 25-25 (1st Cir. 2002) (court lacked subject matter jurisdiction over the plaintiff's claim that the school system failed to follow the procedural requirements because the plaintiff failed to raise those claims before the hearing officer at the due process hearing).

The record shows that Ruffin failed to exhaust her administrative remedies for her claims that HISD failed to provide progress reports, manifestation determination reviews, or qualified teachers. Ruffin filed numerous complaints before the TEA but did not raise these claims. Ruffin filed her initial complaint with the TEA on April 20, 2007 and subsequently filed several amended complaints. In October 2007, the TEA hearing officer issued an order outlining eight issues for review at the due process hearing. The issues did not include the claims that HISD failed to provide progress reports, manifestation determination reviews, or qualified teachers. Ruffin did not seek to

add these claims to the issues for the due process hearing. The administrative record shows that the hearing officer was not asked to, and did not, consider these claims at the due process hearing. Ruffin's failure to raise these claims in the administrative process bars her under the IDEA from raising them for the first time in the federal district court. This court lacks jurisdiction over those claims based on Ruffin's failure to raise them in the administrative review process. HISD's motion for summary judgment is granted on these alleged procedural violations.

Summary judgment is also appropriate on Ruffin's claims that HISD failed to provide proper notice of the February 15, 2007 ARDC meeting and that HISD changed L.F.'s educational placement without Ruffin's knowledge or approval. The record shows that HISD provided Ruffin with proper, timely notice of the February 15, 2007 ARDC meeting. Under the IDEA, a school must schedule meetings at mutually agreeable times and places and provide parents with sufficient notice to allow them an opportunity to attend. 32 C.F.R. § 300.322. Texas law requires a school to provide reasonable notice of an ARDC meeting, which is defined as at least five days before the meeting. 19 TEX. ADMIN. CODE § 89.015. King attempted to schedule a meeting with Ruffin on several occasions, but Ruffin rejected those dates and stated that she was only available on January 30, 2007. Because that date would not allow all interested parties to attend, King proposed a meeting for February 15, 2007. King's phone message to Ruffin was not returned. King had the meeting notice hand-delivered by a courier and sent by U.S. mail. He called Ruffin on the day of the meeting. Ruffin did not respond to any of these meeting notices and did not tell school officials that she could not attend a meeting on February 15, 2007. The record shows that HISD gave Ruffin timely notice of the February meeting. The record also shows that the content of the notice was proper. Under the IDEA, an ARDC meeting notice must specify the purpose, participants, time, and

location of the proposed meeting.  32 C.F.R. § 300.322.  The record shows that each of the multiple notices sent to Ruffin before the February 15, 2007 meeting included the required content, including stating that the ARDC would review L.F.'s recent evaluations and their effect on her educational program.  The absence of a specific reference to ESY services does not make the notice inadequate. HISD gave Ruffin proper and timely notice of the ARDC meeting.

The record also defeats Ruffin's argument that moving L.F. from Ms. Manning's BSC classroom to the classrooms of other special education teachers in the fall of 2006 was a change of placement under the IDEA.  Under the IDEA, a change in educational placement requires prior written notice to the student's parents.  20 U.S.C. § 1415(b)(3).  According to Ruffin, the documents in the record support HISD's liability because "it was [an] administrative decision, to move [L.F.], from class to class."  (Docket Entry No. 36, at 15–16).  "'Educational placement', as used in the IDEA, means educational program–not the particular institution where that program is implemented."  *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 379 (5th Cir. 2003).  "An educational placement . . . is not changed unless a fundamental change in, or elimination of, a basic element of the educational program has occurred."  *Sherri A.D. v. Kirby*, 975 F.2d 193, 206 (5th Cir. 1992).  "[A] change in the particular school site at which a disabled student's 'individualized education program' (IEP) is implemented does not constitute a change in 'educational placement.'" *Veazey v. Ascension Parish School Bd.*, 121 Fed.Appx. 552, 553 (5th Cir. 2005).  Moving a student from one classroom to another or from one teacher to another is not in itself a change in educational placement.  *Id.*  The record shows that L.F.'s IEP continued to be implemented after she no longer attended Ms. Manning's BSC classroom.  King testified that he directed other special education teachers to implement L.F.'s IEPs after she refused to enter Ms. Manning's classroom.  (Transcript

of March 12, 2008 hearing, at 84:18–85:23).  Ms. Manning testified that she provided L.F.'s work materials to the teacher assigned to implement L.F.'s IEPs.  (*Id.* at 138:21–139:1).  Mr. Riley testified that he implemented L.F.'s IEPs "to the letter" after she was assigned to his special education classroom.  (*Id*. at 151:15–23).  The record not only shows that the change in classroom was not a change in educational placement, but also shows that L.F. stopped attending Ms. Manning's class not because of an "administrative directive," but because L.F.'s mother instructed her not to enter that classroom.  The administrative directive to place L.F. with other special education teachers outside the BSC classroom issued only after L.F. refused to enter Ms. Manning's classroom.  The school issued this administrative directive so that L.F.'s IEPs would continue to be implemented by other teachers, ensuring that a change in her educational program would not occur.

Summary judgment is granted on Ruffin's claims alleging procedural violations of the IDEA.

## 2.    Was L.F's IEP Appropriate?

Ruffin also alleges that HISD failed to provide an IEP appropriate for L.F.  Ruffin alleges that L.F. "was just being passed from grade to grade," (Docket Entry No. 1, at 10), and that HISD failed to address L.F.'s behavioral problems because a "Proper BIP (Behavior Intervention Plan) still hasn't been developed, [and L.F.] still exhibit[s] the same behavior concerns (SEVERLY) as [L.F.] experienced since entering in Houston Independent School District," (Docket Entry No. 32, at 5–6).  Ruffin also alleges that HISD failed to implement an IEP that would prevent L.F.'s academic regression.  According to Ruffin, L.F. regressed both behaviorally and academically because her IEPs did not enable her to receive meaningful educational benefits.

In determining whether an IEP is appropriate, courts consider: (1) whether the program is individualized on the basis of the student's assessment and performance; (2) whether the program

28

is administered in the least restrictive environment; (3) whether the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) whether positive academic and nonacademic benefits are demonstrated.  *V.P. ex rel. Juan P.*, --- F.3d ----, 2009 WL 2878053, at *6; *Michael F.*, 118 F.3d at 253.  An IEP must be calculated to provide "meaningful" educational benefit.  *Rowley*, 458 U.S. at 192.  The inquiry does not turn, however, on whether the school provided the student with an education designed to maximize her potential.  *V.P. ex rel. Juan P.*, --- F.3d ----, 2009 WL 2878053, at *4; *Michael F.*, 118 F.3d at 247–48.  Because the IDEA guarantees a "basic floor or opportunity," the school need only provide "access to specialized instruction and related services which are individually designed to provide educational benefit."  *Rowley*, 458 U.S. at 201. "Nevertheless, the educational benefit to which the [IDEA] refers and to which an IEP must be geared cannot be a mere modicum or *de minimis*; rather, an IEP must be 'likely to produce progress, not regression or trivial educational advancement.'" *Michael F.*, 118 F.3d at 248 (quotation and footnotes omitted).  Each of the four criteria are examined below.

### a.      An Individualized Program

The record shows that the 2006-2007 and 2007-2008[2] IEPs for L.F. were individualized for her needs based on her assessment and performance.  L.F. was evaluated, observed, and assessed on multiple occasions by HISD staff, a psychologist, and an education specialist.  School officials, including the ARDC, gathered information from L.F.'s mother and her teachers to develop an

---

[2]  Ruffin argues that the hearing officer's decision that L.F. received a FAPE for the 2007-2008 school year should be disregarded because 2007-2008 was not at issue in the TEA hearing.  This argument is unpersuasive.  As outlined in the hearing officer's October 30, 2007 order, one of the issues for the hearing was "[w]hether HISD failed to implement the IEP from January 2007 to the present."  (Admin Record. at 1868).  The hearing was held on March 12–13, 2008, when the 2007-2008 school year was nearly completed. Moreover, Ruffin challenged the decisions made and implemented as a result of the October 26, 2007 ARDC, which was convened to develop an IEP for L.F. for 2007-2008.

appropriate educational plan for her.  L.F.'s IEPs were based on these assessments and meetings and were tailored to address L.F.'s specific behavioral and educational needs.

The IEP for 2006-2007 was developed at the October 19, 2006 ARDC meeting.  The Committee reviewed L.F.'s behavior evaluations, counseling reports, and teacher reports.  The Committee developed a behavioral support plan to address two of L.F.'s problematic behaviors—bullying and using negative words with her peers and failing to comply with requests from adults.  The plan included specific goals for L.F. to achieve to improve these behaviors, as well as positive reinforcements for complying and consequences for failure to comply.  The Committee decided to continue providing L.F. with thirty minutes of counseling per week to address her behavioral problems.  With respect to academics, the ARDC developed five content-area IEPs tailored to L.F.'s current level of achievement, with goals and objectives for improvement at a rate consistent with past progress.  The Committee agreed that L.F.'s achievement would continue to be measured by the SDAA test.  The ARDC decided to continue L.F.'s placement in the BSC classroom, which satisfied her need for a small, structured environment and for social skills instruction.  When Ruffin disagreed with the placement, the ARDC recessed for two weeks and reconvened after all parties had the opportunity to gather more information.  Because no alternative placement had been approved, the ARDC recommended that L.F. remain in the BSC classroom.  Although Ruffin continued to disagree, a few weeks later, she rejected the HISD's offer to place L.F. at another campus.

L.F.'s 2006-2007 IEP was modified during the middle of the school year based on her December 2006 evaluation and psychological report.  The ARDC met in February 2007 and revised and updated L.F.'s behavioral support plan and all of her IEPs based on the information and

recommendations from the recent evaluations.  The Committee determined that extended school year services were unnecessary because L.F. had not shown regression over previous summer breaks.  L.F. successfully completed fifth grade, achieving all of the ARDC's expectations on the SDAA test.  The record supports the hearing officer's conclusion that L.F.'s IEP for 2006-2007 was individualized, based on the assessments of L.F. and her needs.

Ruffin argues that L.F.'s 2006-2007 IEPs were not sufficiently individualized because "the behavior problems were still out of control, there was no behavior adjustments."  (Docket Entry No. 36, at 24).  This argument is unpersuasive.  A school district is not required to "cure" a disability or correct a student's behavior problems.  *See Daniel R.R.*, 874 F.2d at 1047; *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 642–43 (8th Cir. 2003) (no violation of IDEA when the student's behavioral problems were sufficiently controlled that they did not interfere with the child's learning).  The IDEA requires that, in developing an IEP for "a child whose behavior impedes the child's learning," the school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B) (i).  The record shows that HISD took these steps and implemented several behavioral support plans to improve L.F.'s behavior to allow her to learn in the classroom.  These behavioral support plans were based on evaluations of L.F. by licensed professionals and on the recommendations of those professionals.  The 2006-2007 IEP was sufficiently individualized for L.F.'s needs based on her assessment and performance.

The record also supports the hearing officer's conclusion that the 2007-2008 IEPs were individualized based on an assessment of L.F., her needs, and her performance.  The ARDC first met on May 24, 2007 to develop and put into place L.F.'s IEPs and behavioral support plan for 2007-

31

2008.  The meeting was reconvened in October 2007.  The ARDC reviewed L.F.'s progress, including her SDAA test scores and reports from teachers and counselors.  The ARDC revised and updated the May 2007 IEPs and behavioral support plan to include goals and objectives targeted to building on L.F.'s strengths and improving her  performance in areas of demonstrated weakness.  Based on behavioral and emotional problems L.F. had at the beginning of the fall 2007 school year, the ARDC increased the counseling time for L.F. from thirty minutes per week to sixty minutes per week or more, as needed.  The ARDC recommended continued placement in a BSC classroom and granted Ruffin's request for an independent education evaluation.

The record shows that HISD took extensive steps to evaluate and assess L.F. and continually revised her IEPs and behavioral support plan based on her progress and evaluations.  The IEPs for 2006-2007 and 2007-2008 were highly individualized, based on L.F.'s assessments and educational needs.

**b.    Least Restrictive Environment**

The IDEA requires that "to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in the regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A).  A student must be educated in the "least restrictive environment" appropriate to meet her needs.  20 U.S.C. § 1421(a)(5)(B).  The Fifth Circuit has defined the "least restrictive environment" as "not only freedom from restraint, but the freedom of the child to associate with his or her family and

32

able-bodied peers to the maximum extent possible." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d

127, 128 n. 2 (5th Cir. 1993).  In *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036 (5th Cir. 1989),

the Fifth Circuit developed a two-part test to determine whether this requirement has been met:

> First, we ask whether education in the regular classroom, with the use
> of supplemental aids and services, can be achieved satisfactorily for
> a given child. See § 1412(5)(B). If it cannot and the school intends to
> provide special education or to remove the child from regular
> education, we ask, second, whether the school has mainstreamed the
> child to the maximum extent appropriate.

*Id.* at 1048.  In analyzing these questions, district courts are to consider several factors, including:

"whether the state has taken steps to accommodate the handicapped child in regular education";

"whether the child will receive an educational benefit from regular education"; "the child's overall

educational experience in the mainstreamed environment, balancing the benefits of regular and

special education for each individual child"; and "what effect the handicapped child's presence has

on the regular classroom environment and, thus, on the education that the other students are

receiving."  *Id.* at 1048–49.  This list is not exhaustive and no single factor is dispositive.  *Id.* at

1048.  The "analysis is an individualized, fact-specific inquiry that requires [courts] to examine

carefully the nature and severity of the child's handicapping condition, his needs and abilities, and

the schools' response to the child's needs."  *Id.*

L.F.'s educational program satisfied the least restrictive environment requirements.  The

record shows that before L.F. was placed in the BSC classroom on a part-time basis, her behavior

was distracting to students in the general education classrooms she attended and interfered with their

ability to learn.  The licensed school psychologist evaluated L.F., found that she was "defiant,

impulsive, easily distracted, aggressive[,] and has poor social skills,"  and diagnosed Oppositional

Defiant Disorder and Attention Deficit Hyperactivity Disorder. (Admin. Record at 936).  The

psychologist concluded that L.F.'s "emotional and behavioral functioning have impacted her ability to be successful in the general education setting." (*Id.* at 937). The psychologist concluded that L.F. would benefit from "a structured classroom setting with well-delineated academic and behavioral expectations" because she "needs specialized attention and constant discipline." (*Id.* at 937–38). To comply with this recommendation, the ARDC placed L.F. in the BSC classroom for twenty-five hours per week. L.F. spent the remainder of the school week in general education classrooms. L.F. attended the BSC classroom for twenty-five hours per week in 2006-2007 and 2007-2008, and attended physical education and study lab in a general education classroom. The record shows that HISD implemented L.F.'s IEPs in the least restrictive environment by placing her in the BSC classroom for some, but not all, of the instructional time. This placement allowed "specialized attention and constant discipline," but also allowed L.F. to attend classes with the "mainstream" student population.

This court concludes that HISD implemented L.F.'s IEP and behavioral support plan in the least restrictive environment, complying with the IDEA.

### c.    Key Stakeholders

To demonstrate a lack of coordination among the key stakeholders in providing a student with services, a plaintiff must "show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." *Bobby R*., 200 F.3d at 349. The record shows that the key stakeholders provided L.F. services in a coordinated and collaborative manner. L.F.'s needs were evaluated by a licensed school psychologist, an educational evaluation specialist, and teachers certified in special education. Ruffin was involved in the meetings to develop L.F.'s

34

IEPs and behavioral support plans.  The Special Education Department Chair and a school administrator also participated in developing L.F.'s IEPs.  The ARDC held several meetings each school year and developed, updated, and revised a behavioral support plan and content-area IEPs for L.F.  The educational plan they developed incorporated the conclusions and recommendations of the participants.  Ruffin was kept apprised of her daughter's progress and evaluations.  The record shows that all or substantially all of the IEP provisions were implemented by the ARDC and HISD staff.  The fact that Ruffin disagreed with certain requirements of the IEPs does not show a lack of coordination among the key stakeholders.  *See Lachman v. Illinois St. Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir.) ("[P]arents, no matter how well-motivated, do not have a right under [the IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child".), *cert. denied*, 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988).

### d. Positive Academic and Nonacademic Benefits

The record shows that L.F. received positive, nontrivial, academic and nonacademic benefits during the 2006-2007 and 2007-2008 school years.  It is not necessary for a student to improve in every area to obtain an educational benefit from her IEP.  *See Bobby R.*, 200 F.3d at 350.  Nor is a school district required to "cure" a student's disability.  *See Daniel R.R.*, 874 F.2d at 1047.  L.F.'s teachers and counselors testified at the TEA hearing that she had made progress on behavior and social skills goals.  L.F.'s conduct grades improved from 2007 to 2008.  L.F. passed all of her classes and advanced from grade to grade.  L.F. met or exceeded ARDC expectations on the SDAA test.  "Passing grades and advancement from year to year are factors that indicate a child is receiving meaningful educational benefit." *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*,   --- F.3d ----,

2009 WL 2878053, at *11 (5th Cir. Sept. 9, 2009).  Although L.F.'s test scores and evaluations showed that she performed approximately one grade level below her assigned grade, her progress was consistent and improved by one grade level each year.  Under the IDEA, a child's progress and development "is measured with respect to her individual progress, not her abilities in relation to the rest of the class."  *See V.P. ex rel. Juan P.*, --- F.3d ----, 2009 WL 2878053, at *10; *see also Bobby R.*, 200 F.3d at 349 (a "disabled child's development should be measured not by his relation to the rest of the class, but rather with respect to the individual student").  The record supports the hearing officer's conclusion that L.F. received positive academic and non-academic benefits from her IEPs.

Ruffin argues that L.F.'s reading ability regressed during fifth grade because the October 2006 ARD report stated that L.F. "read fluently in grade appropriate materials" and the February 2007 report called for "remedial reading."  (Docket Entry No. 36).  The record does not support this argument.  The October 2006 ARD report does not state that L.F. was able to read fluently in grade appropriate materials.  The record shows that L.F. was consistently given work and assessed at approximately one grade level below her assigned grade.  In October 2006, the ARDC expected L.F. to score a 4-2 on the reading section of the SDAA test, to be taken at the fourth-grade level.  L.F.'s December 2006 reevaluation stated that she demonstrated "skills that are generally below her current grade placement in the area of . . . reading comprehension."  (Admin. Record at 909).  The evaluator recommended remedial instruction in reading.  (*Id.*).  Based on this evaluation, in February 2007, the ARDC expected L.F. to score a 4-3 on reading.  There is no basis to conclude that L.F. showed regression during her fifth grade year.  To the contrary, the record shows that L.F. exceeded ARDC expectations for reading on the 2007 SDAA test.

**F.      Conclusion on the IDEA Claim**

Examining the record evidence on the alleged procedural violations and on the four factors outlined in *Michael F.*, this court concludes that as a matter of law, HISD complied with the IDEA. L.F.'s IEPs for 2006-2007 and 2007-2008 were reasonably calculated to enable her to receive meaningful educational benefits.  HISD provided L.F. with a free appropriate public education, as required by the IDEA, for the school years at issue in this case.

### G. HISD's Motion for Summary Judgment on the Rehabilitation Act and § 1983 Claims

Ruffin alleges that HISD violated the § 504 of the Rehabilitation Act, which provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.  According to Ruffin, HISD violated this provision because L.F. was "all to[o] often" suspended from school and threatened with juvenile detention when her parent did not pick her up from school.  (Docket Entry No. 1, at 8–9).  In the amended complaint, Ruffin alleged that "[t]his Action arises under . . .; 42 U.S.C. § 1983 . . . as an appeal of a Texas Education Agency ("TEA") hearing officer's decision."  (Docket Entry No. 32).

Ruffin may litigate her own claims under the IDEA in this suit.  But, under the case law of most courts to consider the issue, as a *pro se* litigant, she does not have standing to pursue the Rehabilitation Act or § 1983 claims on behalf of her child.  Ruffin alleges that L.F. was discriminated against because of her disability, but does not allege that her own rights were violated. Ruffin cites *Winkleman* for the proposition that she can bring these claims in federal court.  But most courts have held that "*Winkleman* does not translate into a broad right to pursue any statutory or common law claims on a child's behalf" by a parent proceeding *pro se.  See Woodruff v. Hamilton*

37

*Township Public Schools*, 305 Fed. App'x 833, 836 (3d Cir. 2009) ("[T]he Woodruffs may prosecute their legally cognizable interests in B.W.'s FAPE without an attorney, but *Winkelman* is limited to the IDEA context and does not permit them to litigate the NJLAD, procedural due process, or common law counts alleged in their Amended Complaint."); *see also D.A. v. Pleasantville Sch. Dist.*, 2009 WL 972605, at *8 (D. N.J. Apr. 6, 2009) (declining to extend *Winkelman* and dismissing the parents' ADA and Rehabilitation Act claims); *J.R. ex rel. W.R. v. Sylvan Union Sch. Dist.*, 2008 WL 682595, at *1 (E.D.Cal. March 10, 2008) ("*Winkelman* does not accord these parents the right to pursue non-IDEA claims on behalf of J.R. because the general rule remains that 'a parent or guardian cannot bring an action on behalf of a minor child without retaining a lawyer.'") (quotation omitted); *but see Blanchard v. Morton School Dist.*, 509 F.3d 934, 938 (9th Cir. 2007) (holding that the mother, insofar as she was asserting and enforcing the rights of her son and incurring expenses for his benefit, had standing to bring ADA and Rehabilitation Act claims); *B.D.S. v. Southold Union Free School Dist.*, 2009 WL 1875942, at *15 (E.D.N.Y. June 24, 2009) (the "plaintiff may assert discrimination and retaliation claims under the Rehabilitation Act and ADA, since 'a parent of a child with a disability has a particular and personal interest' in preventing discrimination against that child").

Most of the courts examining the Supreme Court's holding in *Winkelman* have emphasized that it was based on the text, structure, and the "entire statutory scheme" of the IDEA, which "resolve[d] the question presented." 550 U.S. at 523. The Court concluded that the IDEA does not "differentiate . . . between the rights accorded to children and the rights accorded to parents" and contemplates "extensive parental involvement" at all levels, including in the federal courts. *Id.* Although the Rehabilitation Act also permits recovery for "any party aggrieved," it does not involve

a statutory scheme that contemplates coterminous rights.  "Only where the rights of the child and parents are coterminous can the parents pursue, on their own behalf, the claims they share with their child."  *See J.R. ex rel. W.R. v. Sylvan Union Sch. Dist.*, 2008 WL 682595, at *1.  Under these cases, Ruffin cannot represent L.F. in federal court for L.F.'s Rehabilitation Act and § 1983 claims.

Even assuming that Ruffin could litigate the Rehabilitation Act and § 1983 claims on behalf of L.F., the claims fail on the merits, as a matter of law.  The IDEA, the Rehabilitation Act, and the § 1983 claims are all based on the same factual allegations.  This court has concluded that Ruffin has failed to show a violation of the IDEA.  Ruffin cannot show liability under the Rehabilitation Act because she did not allege such a violation before the TEA and the claim has not been administratively exhausted.  The IDEA does not "restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities." 20 U.S.C.A. § 1415(l). However, "before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted . . ."  *Id.*  Before bringing a claim for relief under the Rehabilitation Act based on allegations that overlap with the IDEA, a plaintiff must exhaust administrative remedies with the state education agency.  *See Wood v. Katy Independent School Dist.*, 2009 WL 2485967, at *3 (S.D.Tex. Aug. 06, 2009) (citing *Hope v. Cortines*, 872 F.Supp. 14, 17 (E.D.N.Y. 1995)).  Ruffin failed to exhaust her administrative remedies for the Rehabilitation Act claim, depriving this court of subject-matter jurisdiction over that claim.  And because Ruffin cannot show a violation of the IDEA or the Rehabilitation Act, she cannot show a violation of § 1983.  "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for

vindicating federal rights elsewhere conferred.'" *Flores v. City of Palacios*, 381 F.3d 391, (5th Cir. 2004).  Summary judgment is granted on Ruffin's Rehabilitation Act and § 1983 claims.

## IV.    HISD's Motion for Sanctions

### A.    The Legal Standard

A district court has broad discretion in determining whether a sanction is warranted and what sanction is appropriate.  *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 404, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).  Rule 11 of the Federal Rules of Civil Procedure generally requires an attorney or *pro se* litigant to conduct a reasonable inquiry into the relevant law and facts before signing pleadings, written motions, or other documents, and it prescribes sanctions for violating these obligations.  FED. R. CIV. P. 11; *Mendoza v. Lynaugh*, 989 F.2d 191, 195–96 (5th Cir. 1993). Rule 11 "prohibits filings made with 'any improper purpose,' the offering of 'frivolous' arguments, and the assertion of factual allegations without 'evidentiary support' or the 'likely' prospect of such support."  *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 33, 39 (1st Cir. 2005).  Rule 11(c)(2) requires that a party seeking sanctions must serve the Rule 11 motion on the opposing party and may not file the motion with the district court unless the offending filing is not withdrawn or corrected within 21 days after service.  FED. R. CIV. P. 11(c)(2).  HISD complied with this safe-harbor notice requirement.

"Determinations under Rule 11 often involve 'fact-intensive, close calls.'"  *Clark v. United Parcel Serv., Inc.*, 460 F.3d 1004 (8th Cir. 2006) (quoting *Cooter & Gell*, 496 U.S. at 404).  To support a frivolousness finding, the fault need not be a subjectively reckless state of mind.  But the offending party "must, at the very least, be culpably careless to commit a violation."  *Young*, 404 F.3d at 39.  The rule "establishes an objective standard, intended to eliminate any 'empty-head

40

pure-heart' justification for patently frivolous arguments." FED. R. CIV. P. 11 (Advisory Committee Notes, 1993 amendments); *see also Tahfs v. Proctor*, 316 F.3d 584, 594 (6th Cir. 2003) ("A good faith belief in the merits of a case is insufficient to avoid sanctions.").

### B.   Analysis

In her amended complaint filed in this court, Ruffin referred to the hearing officer as HISD's counsel's "close friend," "partner," and "lover," and alleged that the hearing officer's decisions were based on "bedroom affairs." (Docket Entry No. 32). HISD argues that these allegations are sanctionable and asks this court to strike all pleadings containing them and order Ruffin to pay monetary sanctions.[3]

Ruffin argues that the statement by counsel for HISD that he and the hearing officer had a "professional relationship" and a "healthy respect for one another" confirms her allegations of an inappropriate relationship. This argument is without basis. The record shows no basis for the accusation Ruffin made. The record supports the conclusion that Ruffin did not make a reasonable prefiling inquiry into the factual basis for this accusation. Ruffin does not point to any evidence, other than her own suspicion, that would provide a reasonable basis to believe the accusation was true. Moreover, when Ruffin made this accusation, she was aware that it had been previously rejected as baseless by an independent TEA hearing officer. Ruffin filed other administrative complaints against HISD, one on behalf of L.F. and  another on behalf of her son, K.F. These

---

[3]    Ruffin moved to "order this court to order this defendant to submit documents that support the allegation that plaintiff has often included similar attacks." (Docket Entry No. 42). The motion is apparently based on HISD's statement, in moving for sanctions, that this is not the first time Ruffin has made these allegations. Ruffin's motion is denied. The record shows that Ruffin made similar allegations of an inappropriate relationship between the TEA hearing officer and counsel for HISD in other administrative proceedings involving the same parties.

complaints were heard by the same TEA hearing officer involved in this case.  Ruffin moved twice to recuse the hearing officer on the basis that she and HISD's counsel had an inappropriate relationship.  The recusal motions were referred to another TEA hearing officer, who denied them in August 2008 and October 2008.

The record provides a basis to sanction Ruffin.  The issue is what sanction is appropriate. The Fifth Circuit has repeatedly admonished lower courts to impose the "least severe sanction" adequate to deter future misconduct.  *See Topalian v. Ehrman*, 3 F.3d 931, 938 (5th Cir. 1993).  The range of appropriate sanctions depends on the circumstances of each case.  *Thomas v. Capital Security Servs.*, *Inc.*, 836 F.2d 866, 877 (5th Cir. 1988).  A district court has broad discretion to consider "special circumstances" that arise in cases involving *pro se* litigants.  FED. R. CIV. P. 11 (Advisory Committee Notes, 1983 amendments).  *Pro se* litigants are often "severely limited in [their] ability to make effective use of legal materials and apply the law to objective reality." *Pankey v. Webster*, 816 F.Supp. 553, 562 (W.D. Mo. 1993).  Ruffin's *pro se* status is appropriately considered; it does not excuse the conduct but does affect the nature of the sanction.  *See Simpson v. Lear Electronics Corp.*, 77 F.3d 1170, 1177 (9th Cir. 1995) ("[W]hile a district court can properly consider a plaintiff's pro se status in assessing sanctions, it cannot decline to impose any sanction where a violation has arguably occurred simply because the plaintiff is proceeding *pro se*.").  This court concludes that the appropriate sanction in this case is to strike the filings containing allegations of an inappropriate relationship.  Docket Entry Nos. 31, 32, 44, and 50, are stricken.  This court admonishes Ruffin that if she continues to raise these offensive and inappropriate accusations with no factual basis, she may be subject to monetary or other sanctions.

VI.     **Conclusion**

42

HISD's motion for sanctions is granted in part and denied in part.  HISD's motion for summary judgment is granted.   Final judgment is entered by separate order.

SIGNED on September 21, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge